1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 NEW HARVEST CHRISTIAN FELLOWSHIP,

Case No. 19-cv-00334-SVK

8 Plaintiff,

**ORDER ON (1) MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CITY OF SALINAS; (2) MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NEW HARVEST CHRISTIAN FELLOWSHIP; AND (3) REQUEST FOR JUDICIAL NOTICE OF PLAINTIFF NEW HARVEST CHRISTIAN FELLOWSHIP**

9

10 v.

11

12 CITY OF SALINAS,

13 Defendant.

Re: Dkt. Nos. 28, 35, 41

14

15     Plaintiff New Harvest Christian Fellowship ("New Harvest") challenges zoning decisions

16 by Defendant City of Salinas ("Salinas" or "the City") that New Harvest claims affect its ability to

17 conduct a religious assembly on the ground floor of a building it purchased located at 344 Main

18 Street in downtown Salinas (the "Beverly Building"). New Harvest alleges that the City's zoning

19 code and denial of New Harvest's proposed use of the Beverly Building treat New Harvest on less

20 than equal terms with nonreligious assemblies and substantially burden religious exercise, in

21 violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C.

22 § 2000cc *et seq*. Dkt. 1 at ¶¶ 53-63. The parties have consented to the jurisdiction of a magistrate

23 judge. Dkt. 6, 12.

24     Both parties seek summary judgment on all claims. Dkt. 28, 35. The Court heard oral

25 arguments on April 14, 2020. After considering the arguments at the hearing, the parties'

26 submissions, the case file, and relevant law, the Court **DENIES** New Harvest's motion for

27 summary judgment and **GRANTS** the City's motion for summary judgment.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   **I.    BACKGROUND**

2          The City's zoning code specifies a "Central City Overlay" district and, within that, a

3   "Downtown Core Area."  Dkt. 28-5 (Hunter Decl.) at ¶ 4 and Ex. C.  Most of the Downtown Core

4   Area is classified as "mixed use."  *Id.*  However, in 2006, the City amended its zoning code to

5   include a prohibition on "[c]lubs, lodges, places of religious assembly, and similar assembly uses"

6   on the ground floor of buildings facing Main Street in the 100 to 300 blocks of Main Street.  *Id.* at

7   ¶ 5 and Ex. C at 4 (Section 37-40.310(a)(2)).  This three-block area lies within the larger

8   Downtown Core Area.  *Id.* at ¶ 4.  For purposes of this order, the Court will refer to this zoning

9   restriction as the "assembly uses provision" and will refer to the 100 to 300 blocks of Main Street

10  as the "Main Street restricted area."

11         According to the City, the purpose of the assembly uses provision is "to stimulate

12  commercial activity within the City's downtown, which had been in a state of decline, and to

13  establish a pedestrian-friendly, active and vibrant Main Street."  *Id.* at ¶ 5.  Aside from "normal

14  [Conditional Use Permit] requirements," there is no restriction on assembly uses in the Downtown

15  Core Area outside the three blocks of the Main Street restricted area, and there is no prohibition on

16  assembly uses within the Main Street restricted area above the ground floor.  *Id.*

17         New Harvest is part of a consortium of churches called New Harvest that is "like a

18  denomination, but without a hierarchy of leadership" and has "beliefs [that] fall within the general

19  stream of conservative, Evangelical, Pentecostal doctrine."  Dkt. 36 (Torres Decl.) at ¶ 2.  New

20  Harvest currently operates from a rented facility in downtown Salinas located at 357 Main Street

21  under a conditional use permit ("CUP") issued in 1994.  *Id.* at ¶ 17; Dkt. 28-5 at ¶ 3.  The CUP has

22  been extended twice; the second extension was a three-year extension granted in June 2000.  Dkt.

23  28-5 at ¶ 3.  At the time of the last CUP extension, New Harvest told the City it did not intend to

24  occupy 357 Main on a long-term basis, expected to be at the location for up to an additional three

25  years, and was hoping to either buy a permanent building or build elsewhere.  *Id.* at ¶ 3 and Ex. B

26  at 2.  Nevertheless, New Harvest has since continued to use the building at 357 Main Street as a

27  "legal nonconforming use."  *Id.* at ¶ 3.

28         New Harvest's weekly schedule of activities includes a Sunday morning worship service

1 (including a worship band) and programs for children and teens/tweens; a Tuesday evening

2 worship service, "Fun Club" for children ages 3-4, and boys' ministries (which alternate weekly

3 between two different age groups); a Thursday evening worship band rehearsal; a Friday evening

4 prayer meeting; and a women's Bible study on some Saturday mornings.  Dkt. 36 at ¶¶ 11-16.

5 Some of the children's ministries take place in buildings near New Harvest's current location due

6 to lack of space.  *Id.* at ¶ 12.  New Harvest has also had to discontinue its girls' ministry due to

7 lack of space.  *Id.* at ¶ 13.

8       In March 2018, New Harvest closed escrow on the purchase of the Beverly Building,

9 which is located at 344 Main Street, within the Main Street restricted area.  *Id.* at ¶ 21; Dkt. 1 at

10 ¶ 27.  In January 2018, New Harvest filed applications for a zoning code amendment and CUP to

11 allow it to conduct worship services on the ground floor of the Beverly Building.  Dkt. 28-5 at ¶ 7.

12 At an August 2018 hearing, the City's Planning Commission voted to deny New Harvest's

13 applications based on the assembly uses provision.  *Id.* at ¶ 9 and Ex. E.  New Harvest appealed

14 the Planning Commission's decision to the City Council, which denied the appeal and approved

15 the Planning Commission's decision on November 6, 2018, following a public hearing.  *Id.* at ¶ 10

16 and Ex. F.  On the same date, the City Council amended the definition of "religious assembly" in

17 the assembly uses provision so that the definition did not include schools, day care centers,

18 offices, or retail.  *Id.* at ¶ 10 and Ex. G.

19 **II.     LEGAL STANDARD**

20       Summary judgment is appropriate if the moving party shows that there is no genuine

21 dispute as to any material fact and the party is entitled to judgment as a matter of law.  Fed. R.

22 Civ. P. 56(a).  A fact is material if it may affect the outcome of the case.  *Anderson v. Liberty*

23 *Lobby, Inc.*, 477 U.S. 242, 248 (1985).  A genuine dispute of material fact exists if there is

24 sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

25       The party moving for summary judgment bears the initial burden of informing the court of

26 the basis for the motion and identifying portions of the pleadings, depositions, answers to

27 interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

28 fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

United States District Court
Northern District of California

3

1    Where the party moving for summary judgment has the burden of persuasion at trial, such

2 as where the moving party seeks summary judgment on its own claims or defenses, the moving

3 party must establish "beyond controversy every essential element of its [claim]." *So. Cal. Gas Co.*

4 *v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).  Where the moving

5 party seeks summary judgment on a claim or defense on which the opposing party bears the

6 burden of persuasion at trial, "the moving party must either produce evidence negating an essential

7 element of the nonmoving party's claim or defense or show that the nonmoving party does not

8 have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

9 *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the

10 moving party meets its initial burden, the burden shifts to the nonmoving party to produce

11 evidence supporting its claims or defenses.  *Id*. at 1103.  If the nonmoving party does not produce

12 evidence to show a genuine issue of material fact, the moving party is entitled to summary

13 judgment.  *Celotex*, 477 U.S. at 323.

14    "The court must view the evidence in the light most favorable to the nonmovant and draw

15 all reasonable inferences in the nonmovant's favor."  *City of Pomona v. SQM N. Am. Corp.*, 750

16 F.3d 1036, 1049 (9th Cir. 2014).  However, the party opposing summary judgment must direct the

17 court's attention to "specific, triable facts."  *So. Cal. Gas*, 336 F.3d at 889.  "[T]he mere existence

18 of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for

19 summary judgment.  *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not

20 lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

21 *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

22 *Corp.*, 475 U.S. 574, 587 (1986)).

23 **III.    EVIDENTIARY ISSUES**

24    **A.    Evidentiary objections**

25       **1.    New Harvest's objections**

26    New Harvest filed objections to the Declarations of Megan Hunter and Gregory R. Aker,

27 which were submitted by the City in support of its summary judgment motion, under Federal Rule

28 of Evidence 408 on the grounds that selected portions of those declarations refer to settlement

United States District Court
Northern District of California

4

1    discussions. Dkt. 46. The evidence to which New Harvest objects concerns discussions between

2    the City and New Harvest regarding possible modifications to the Beverly Building that would

3    place commercial pedestrian-oriented activities on the ground floor facing Main Street and allow

4    the church to hold worship services at the back portion of the ground floor. *Id.*[1]

5         New Harvest's evidentiary objections are **OVERRULED** on both procedural and

6    substantive grounds. First, Civil Local Rule 7-3(a) requires that "[a]ny evidentiary and procedural

7    objections to [a] motion must be contained within the [opposition] brief or memorandum." New

8    Harvest's filing of a separate document containing evidentiary objections is in violation of this

9    Civil Local Rule. Second, Federal Rule of Evidence 408, upon which New Harvest relies, states

10   that evidence of settlement negotiations is not admissible "either to prove or disprove the validity

11   or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction"

12   but "[t]he court may admit this evidence for another purpose." Therefore, even assuming that the

13   evidence to which New Harvest objects relates to settlement negotiations between the parties, the

14   Court may consider that evidence for purposes other than the validity or amount of New Harvest's

15   claim or as impeachment. Nevertheless, the evidence of alleged discussions between the City and

16   New Harvest regarding possible modifications to New Harvest's proposed use of Beverly

17   Building is not material to the Court's analysis of New Harvest's RLUIPA claims.

18              **2.      The City's objections**

19         The City objects to the Declaration of Robert W. Burgess submitted by New Harvest in

20   support of its motion for summary judgment. Dkt. 48 at 21-22. The City argues that the Court

21   should exclude Mr. Burgess's testimony because: (1) New Harvest did not disclose Mr. Burgess

22   by the expert witness disclosure deadlines in this case; (2) Mr. Burgess's testimony is lay opinion

23   barred under Federal Rule of Evidence 701; and (3) Mr. Burgess's testimony violates the standard

24   set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 592 (1993), because it is "devoid of any

25   explanation as to the 'reasoning' or 'methodology' used in reaching his conclusion." *Id.*

26         The City's objection to Mr. Burgess's declaration is **OVERRULED**. Although Mr.

27

28   _____

[1] New Harvest's opposition to the City's summary judgment motion addresses this evidence notwithstanding the evidentiary objections. *See* Dkt. 45 at 6-7.

United States District Court
Northern District of California

1    Burgess cannot testify as an expert in this case due to New Harvest's failure to disclose him, the

2    declaration provides adequate foundation for the Court to consider Mr. Burgess as a fact witness

3    concerning the current availability of other properties in Salinas.

4    **B.    Plaintiff's Request for Judicial Notice**

5    New Harvest filed a request that the Court take judicial notice of several items.  Dkt. 41.

6    The City did not oppose the request for judicial notice.

7    The Court may judicially notice a fact that "is not subject to reasonable dispute because it:

8    (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

9    readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

10    201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).

11    New Harvest seeks judicial notice of the articles of incorporation of Ariel Theatre.  Dkt. 41

12    at 2.  Articles of incorporation are subject to judicial notice.  *In re Yahoo! Inc. Shareholder Deriv.*

13    *Litig.*, 153 F. Supp. 3d 1107, 1117 (N.D. Cal. 2015).  The remaining items in New Harvest's

14    request for judicial notice are portions of the Salinas Zoning Code.  Dkt. 41 at 2.  Municipal

15    ordinances are proper subjects of judicial notice.  *Tollis Inc. v. City of San Diego*, 505 F.3d 935,

16    938 n.1 (9th Cir. 2007).

17    Accordingly, the Court **GRANTS** New Harvest's request that the Court take judicial

18    notice to Exhibits 3-7 to the Declaration of Kevin Snider (Dkt. 40).

19    **IV.    DISCUSSION**

20    RLUIPA was enacted "to protect the free exercise of religion guaranteed by the First

21    Amendment from government regulation."  *Guru Nanak Sikh Soc. Of Yuba County v. County of*

22    *Sutter*, 456 F.3d 978, 985 (9th Cir. 2006).  RLUIPA contains several provisions limiting

23    government regulation of land use, referred to as:  (1) the substantial burden provision, (2) the

24    equal terms provision, (3) the nondiscrimination provision, and (4) the exclusions and limits

25    provision.  *See* 42 U.S.C. § 2000cc; *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*,

26    651 F.3d 1163, 1169 and n.24 (9th Cir. 2011).  In this case, New Harvest asserts claims under

27    RLUIPA's substantial burden and equal terms provisions. Dkt. 1 at ¶¶ 53-63.  Each party seeks

28    summary judgment on both of New Harvest's RLUIPA claims and agrees that this case can

United States District Court
Northern District of California

1  properly be resolved on summary judgment.  Dkt. 28, 35.

2    **A.**  **Substantial Burden Claim**

3    A government land use regulation that imposes a substantial burden on the religious

4  exercise of a religious assembly or institution is unlawful under RLUIPA "unless the government

5  demonstrates that imposition of the burden … is in furtherance of a compelling government

6  interest; and is the least restrictive means of furthering that compelling government interest."  *Int'l*

7  *Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066 (9th Cir. 2011)

8  (quoting 42 U.S.C. § 2000cc(a)(1)).  The plaintiff bears the burden of persuasion as to whether the

9  City zoning ordinance, or the City's application of that ordinance to the plaintiff, "substantially

10  burdens" the plaintiff's exercise of religion.  *San Jose Christian College v. City of Morgan Hill*,

11  360 F.3d 1024, 1034 (9th Cir. 2004).  Even if the plaintiff establishes a *prima facie* case of

12  violation of RLUIPA such that the burden shifts to the government, the burden of establishing

13  "substantial burden" remains with the plaintiff.  *Centro Familiar*, 651 F.3d at 1171 (citing 42

14  U.S.C. § 2000cc-2(b)).

15    The City does not dispute that New Harvest is a religious assembly or institution.  *See*

16  Dkt. 28.  RLUIPA provides that "[t]he use, building, or conversion of real property for the purpose

17  of religious exercise shall be considered to be religious exercise of the person or entity that uses or

18  intends to use the property for that purpose."  42 U.S.C. § 2000cc-5(7)(B).  The activities that

19  New Harvest seeks to conduct at the Beverly Building include religious assemblies.  *See* Ex. F to

20  Dkt. 28-5 at 1.  Such activities constitute a "religious exercise" within the meaning of RLUIPA's

21  substantial burden provision.  *See* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" to

22  include "any exercise of religion, whether or not compelled by, or central to, a system of religious

23  belief").

24    The Court next considers whether the City's zoning decisions have imposed a substantial

25  burden on the religious exercise of New Harvest.  The Court's analysis under the substantial

26  burden provision "proceeds in two sequential steps."  *Foursquare Gospel*, 673 F.3d at 1066.

27  "First, the plaintiff must demonstrate that a government action has imposed a substantial burden

28  on the plaintiff's religious exercise."  *Id.*  "Second, once a plaintiff has shown a substantial burden,

United States District Court
Northern District of California

7

1   the government must show that its action was 'the least restrictive means' of 'further[ing] a

2   compelling government interest.'"  *Id.* (citation omitted).  Thus, the Court must first find that the

3   disputed regulation creates a "substantial burden" before reaching the question of "compelling

4   interest."  Whether a land use regulation imposes a substantial burden is a question of law.  *See*

5   *id.; see also Livingston Christian Schools v. Genoa Charter T'ship*, 858 F.3d 996, 1001 (6th Cir.

6   2017).

7           The Ninth Circuit has held that "for a land use regulation to impose a substantial burden, it

8   must be oppressive to a significantly great extent"; in other words, "a substantial burden on

9   religious exercise must impose a significantly great restriction or onus upon such exercise."  *San*

10  *Jose Christian College*, 360 F.3d at 1034 (internal quotation marks and citations omitted).  Three

11  key factors in determining "substantial burden" are (1) feasible alternative; (2) uncertainty, delay,

12  expense; and (3) Plaintiff's own actions.  *See Foursquare Gospel*, 673 F.3d at 1068; *Spirit of*

13  *Aloha Temple v. County of Maui*, 322 F. Supp. 3d 1051, 1065 (D. Hawai'i 2018) (citing

14  *Livingston Christian Schools*, 858 F.3d at 1004).

15                      **1.      Feasible alternatives**

16          In evaluating whether a land use regulation imposes a substantial burden, the availability

17  of feasible alternatives to the property affected by the challenged land use regulation is a relevant

18  consideration under Ninth Circuit law.  For example, the Ninth Circuit affirmed a district court's

19  entry of summary judgment in favor of a city on a college's RLUIPA substantial burden claim

20  where "there is no evidence in the record demonstrating that College was precluded from using

21  other sites within the city."  *San Jose Christian College*, 360 F.3d at 1035-36.  By contrast, the

22  Ninth Circuit affirmed summary judgment in favor of a religious organization on its RLUIPA

23  substantial burden claim where a county denied of the organization's applications for a conditional

24  use permit on two different properties, finding that "[t]he net effect of the County's two denials …

25  is to shrink the large amount of land theoretically available to [the religious organization] under

26  the Zoning Code to several scattered parcels that the County may or may not ultimately approve."

27  *Guru Nanak Sikh Soc.*, 456 F.3d at 991-92

28          A case that illustrates the significance of feasible alternatives to the substantial burden

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    analysis is *Victory Center v. City of Kelso*, which involved a zoning regulation that, similar to the

2    regulation in this case, sought to encourage pedestrian-oriented retail activity on the street level

3    within a four-block subarea of the city's "Commercial Town Center."  No. 3:10-cv-5826-RBL,

4    2012 WL 1133643, at *1 (W.D. Wash. Apr. 4, 2012).  A Washington district court granted

5    summary judgment in favor of the city on a religious organization's RLUIPA substantial burden

6    claim, finding that city's zoning regulations "do not impose a substantial burden of the Victory

7    Center's religious exercise because the Victory Center is free to locate its facility anywhere

8    outside the [Commercial Town Center] flour-block subarea dedicated to pedestrian retain activity"

9    or even "within this subarea anywhere above the first floor." *Id.* at *4.  The court noted that "[t]he

10   city estimates that the restricted area represents less than one eighth of one percent of zoned land

11   within the city limits" and "locating outside of this small area does not substantially impede the

12   Victory Center's ability to practice religious activities," particularly where "the Victory Center has

13   not presented any evidence that the [location at issue] bears any religious significance … and any

14   burden imposed by the [] land use restrictions is merely a matter of personal or economic

15   convenience." *Id.*

16        It appears to be undisputed that New Harvest's current location at 357 Main Street is not a

17   feasible alternative.  In addressing other sites, both parties submit evidence in the form of

18   declarations regarding the availability of alternatives.  New Harvest submits the declaration of

19   Robert W. Burgess, a licensed commercial real estate broker who is familiar with commercial

20   properties in the City.  Dkt. 38 (Burgess Decl.) at ¶¶ 1-3.  Mr. Burgess states that as of the date of

21   his declaration (February 18, 2020), only three of the 24 locations advertised for sale were in "the

22   size range that might be considered." *Id.* at ¶ 5.  Mr. Burgess indicates that two of the three

23   properties are leased investments that were occupied and for which New Harvest would act as a

24   landlord. *Id.*  The third location is a 14,700 square foot church offered for sale at $2345,000 ($160

25   per square foot). *Id.*  That property is located at 747 El Camino Real, nine miles north of Main

26   Street, and can be reached by driving north from Salinas on Highway 101 North and making a U-

27   turn on the highway to reach the property via Highway 101 South. *Id.;* Dkt. 48-1 at Ex. E.

28        The City has presented evidence that New Harvest told the City at least as early as June

1    2000 that it was looking for a new location.  Dkt. 28-5 at ¶ 3 and Ex. B at 2.  The City submits the

2    declaration of Dean Chapman, a consulting expert in the field of appraised value of commercial or

3    residential real property and other real estate matters.  Dkt. 48-3 (Chapman Decl.) at ¶ 2.

4    Mr. Chapman states that based on his review of public records for the period 2012 to 2019, he

5    identified the sales of nine churches and other properties with square footage suitable to house

6    New Harvest's religious worship and other activities and within or close to its price range.  *Id.* at

7    ¶ 4 and Ex. B.  The City has also presented evidence that it has denied only one of over 100

8    conditional use permit applications submitted by churches over the past fifty years.  Dkt. 28-5 at

9    ¶ 12.  Meanwhile, according to Pastor Torres, who testified as New Harvest's Rule 30(b)(6)

10   designee, New Harvest considered only two properties between 2003 and its purchase of the

11   Beverly Building in 2018:  one property was unavailable because it was zoned industrial, and New

12   Harvest did not submit a purchase offer for the second because Pastor Torres was out of the

13   country.  Ex. A to Dkt. 48-1 at 78:13-81:13.

14       New Harvest has not presented any evidence to counter the City's evidence of feasible

15   alternative locations.  Notably, the evidence submitted by New Harvest focuses only on church

16   locations available at present, even though by its own admission has been considering a move for

17   many years.  Dkt. 28-5 at ¶ 3 and Ex. B at 2 (minutes of June 2000 Planning Commission meeting

18   at which New Harvest's attorney stated that New Harvest "may need to be [at its current location]

19   another three years, as they are hoping to either buy a permanent building or build elsewhere");

20   *see also* Dkt. 36 at ¶ 20 (statement by Pastor Torres that New Harvest "looked for years at

21   commercial properties to buy or lease within Salinas.").  As to the one presently-available church

22   property identified by New Harvest, New Harvest does not establish any reason why that property

23   would not be a feasible alternative.  The fact that any church members coming from the direction

24   of downtown Salinas would have to make a U-turn does not establish that the location is

25   unsuitable. Moreover, New Harvest has failed to offer any evidence as to (1) other properties (not

26   currently configured as a church) that are available at present, (2) other properties that were

27   available in  relevant past years, or (3) other properties that are expected to become available in

28   the future.

United States District Court
Northern District of California

10

1    Even without evidence concerning specific available properties, such as that presented by

2    the City in this case, courts in this circuit have rejected substantial burden claims based on the

3    religious organization's ability to relocate elsewhere.  *See, e.g., Victory Center*, 2012 WL

4    1133643, at *4 (granting summary judgment to city on undue burden claim under RLUIPA where

5    plaintiff was free to locate its facility anywhere outside the four-block area affected by the

6    disputed zoning ordinance); *see also Daniel and Francine Scinto Found'n v. City of Orange*, No.

7    SA CV 15-1537-DOC (JCGx), 2016 WL 4150453, at *11 (C.D. Cal. 2016) (denying plaintiff's

8    motion for summary judgment on RLUIPA undue burden claim where plaintiff did not cite

9    anything indicating it was precluded from carrying out its religious mission or religious activities

10   at other locations).

11   Accordingly, the availability of alternative locations is evidence that that the City's zoning

12   restrictions that apply to the Church's desired operations at the Beverly Building do not constitute

13   a substantial burden.

### 2.    Uncertainty, delay, and expense

15   Where the alternative locations require substantial delay, uncertainty, or expense, a

16   substantial burden may exist.  *Foursquare Gospel*, 673 F.3d at 1068.  The only evidence New

17   Harvest has presented on this point is that the alternative location identified by Mr. Burgess would

18   require people travelling from the direction of downtown Salinas to make a U-turn.  Dkt. 38 at ¶ 5;

19   Ex. E to Dkt. 48-1.  As discussed above, New Harvest has failed to demonstrate why this fact

20   renders the alternative location substantially burdensome.  Thus, New Harvest has failed to show

21   that the City's zoning actions subject it to substantial delay, uncertainty, or expense that might

22   constitute a substantial burden.

### 3.    New Harvest's own actions

24   The City presents evidence that New Harvest was aware at the time it bought the Beverly

25   Building that it was not zoned for assembly uses on the ground floor and that the City would

26   oppose the church's efforts to conduct religious services there.  Ex. A to Dkt. 28-1 at 153:6-

27   155:19; Ex. D to Dkt. 28-5 at 17:19-18:12; *see also* Dkt. 1 at ¶¶ 31, 33.  The City argues that a

28   self-imposed burden is not a substantial burden under RLUIPA and that thus New Harvest cannot

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    prevail on its substantial burden claim because New Harvest purchased the Beverly Building

2    without a reasonable expectation of being allowed to use that property for its intended religious

3    purposes.  *See* Dkt. 28 at 13-14 (citing *Livingston Christian Schools*, 858 F.3d at 1004; *Andon,*

4    *LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016); *Petra Presbyterian Church*

5    *v. Village of Northbrook,* 489 F.3d 846, 851 (7th Cir. 2007)).

6        New Harvest argues that "[i]n this jurisdiction, it is not an affirmative defense to any of

7    RLUIPA's four provisions that a religious institution acquired property 'without a reasonable

8    expectation of being able to use that land for religious purposes.'"  Dkt. 45 at 3 (citing City's

9    motion for summary judgment at 12).  New Harvest notes that the authorities cited by the City in

10   support of its self-imposed burden argument are from other circuits.  Dkt. 45 at 2-3. New Harvest

11   also cites several cases from the Ninth Circuit and courts within the circuit in which churches

12   prevailed despite apparently purchasing properties prior to permit approval and with knowledge of

13   zoning restrictions.  *Id* at 3-4 and cases cited therein.

14       The Court is not persuaded by New Harvest's argument.  None of the in-circuit cases it

15   cites rejected or even discussed the self-imposed burden doctrine followed in other circuits.  In

16   fact, at least one district court within the Ninth Circuit recently relied on the self-imposed burden

17   doctrine (as articulated in *Livingston Christian Schools* and other out-of-circuit authorities cited by

18   the City) in evaluating a claim of substantial burden under RLUIPA.  *See Spirit of Aloha Temple v.*

19   *County of Maui,* 322 F. Supp. 3d at 1065.  Under these circumstances, the Court is free to look to

20   other circuits for guidance, and the Court finds the cases cited by the City persuasive on this point.

21       New Harvest's own actions in buying the Beverly Building when it knew that it was not

22   zoned for ground floor assemblies and having been expressly informed that the City would oppose

23   the church's efforts to conduct religious services on the ground floor is evidence that the City's

24   actions do not impose a substantial burden within the meaning of RLUIPA.

25              **4.     Conclusion on substantial burden claim**

26       New Harvest's substantial burden argument is that the City's zoning restriction denies

27   New Harvest the use of one suitable space and thus constitutes a substantial burden on the exercise

28   of its religious beliefs.  *See* Dkt. 35 at 18-19; Dkt. 50 at 5-6.  At its core, this is an argument that

12

1     churches are exempt from zoning restrictions.  That is not the law.  *See, e.g., San Jose Christian*

2     *College*, 360 F.3d at 1035 (affirming summary judgment for city on RLUIPA substantial burden

3     claim because "while the [City's] ordinance may have rendered [the religious institution] unable to

4     provide education and/or worship at the Property, there is no evidence in the record demonstrating

5     that [the religious institution] was precluded from using other site within the city" nor "any

6     evidence that the City would not impose the same requirements on any other entity").

7          Applying the proper legal standards and considering the record as a whole—including

8     evidence regarding the availability of feasible alternative locations; the absence of evidence

9     concerning uncertainty, delay, and expense to New Harvest associated with those alternative

10    locations; and evidence that the burden of which New Harvest complains is self-imposed—the

11    Court concludes that New Harvest has not carried its burden of demonstrating that the City's

12    actions have imposed a substantial burden on New Harvest's religious exercise.  *See Foursquare*

13    *Gospel*, 673 F.3d at 1066.  Accordingly, New Harvest's motion for summary judgment on its

14    substantial burden claim is **DENIED** and the City's motion for summary judgment on that claim

15    in **GRANTED.**

16          **B.      Equal Terms Claim**

17          Under RLUIPA's equal terms provision, governments are prohibited from imposing land

18    use restrictions on a religious assembly "on less than equal terms" with a non-religious assembly.

19    *Centro Familiar*, 651 F.3d at 1169 (citing 42 U.S.C. § 2000cc(b)).  To succeed on a claim under

20    the equal terms provision, the claimant must demonstrate four elements:  (1) an imposition or

21    implementation of a land use regulation, (2) by a government, (3) on a religious assembly or

22    institution, (4) on less than equal terms with a nonreligious assembly or institution.  *Id.* at 1170-71.

23    In analyzing a claim under the equal terms provision, courts examine whether a government

24    regulation subjects religious and secular assemblies or institutions that are "similarly situated with

25    respect to an accepted zoning criteria" to different land use treatment.  *See id.* at 1173; *see also*

26    *Corp. of the Catholic Archbishop of Seattle v. City of Seattle*, 28 F. Supp. 3d 1163, 1167 (W.D.

27    Wash. 2014).  If a religious institution demonstrates all four prongs of an equal terms claim, the

28    burden of proof shifts to the government on all elements.  *Centro Familiar*, 651 F.3d at 1171

United States District Court
Northern District of California

13

1    (citing 42 U.S.C. § 2000cc-2(b)).

2                    **1.      Facial violation**

3            Section 37-40.310(a)(2), (3) does not, on its face, establish a *prima facie* violation of

4    RLUIPA's equal terms provision.  Such a violation has been found where, for example, a city

5    code allowed secular membership organizations as of right but required religious organizations to

6    obtain a conditional use permit.  *See Centro Familiar*, 651 F.3d at 1175.  By contrast, the text of

7    Salinas's zoning provision treats secular and religious places of assembly the same:  neither are

8    allowed on the ground floor in the Main Street restricted area.  Section 37-40.310(a)(2)

9    ("Assembly and Similar Uses.  Clubs, lodges, places of religious assembly, and similar assembly

10   uses shall only be permitted above the ground floor of buildings facing Main Street within the

11   downtown core area.").  As such, New Harvest has failed to demonstrate that the assembly uses

12   provision, on its face, violates RLUIPA's equal terms provision.  *See Calvary Chapel Bible*

13   *Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020).

14           New Harvest also argues that Salinas's zoning ordinance violates the equal terms provision

15   because it allows "live entertainment" in the form of "musical, theatrical, dance, karaoke, cabaret

16   or comedy act" in secular venues but not religious assemblies within the Main Street restricted

17   area.  Dkt. 35 at 10-11 (citing Zoning Code Section 37-40-.310(a)(3)(A)).  This argument

18   overlooks the fact that these six types of entertainment are permitted in the Main Street restricted

19   area only as *accessory uses* to a permitted underlying principal use, such as a restaurant, art

20   gallery, music studio, or food and beverage sales establishment.  *See* Ex. C to Dkt. 28-5 at Section

21   37-40.310(a)(3).  On its face, this accessory use provision is neutral as to content, allowing both

22   religious and secular music and other entertainment as accessories to otherwise-permitted uses.

23   Thus, the existence of the accessory uses provision also does not establish a facial violation of

24   RLUIPA's equal terms provision.

25                    **2.      "As applied" violation**

26           Turning to the question of whether the City's application of its zoning ordinance violates

27   RLUIPA's equal terms provision, the Court views the key inquiry to be as set forth in *Centro*

28   *Familiar*:  the City violates the equal terms provision only when a church is treated on less than

United States District Court
Northern District of California

14

1    equal basis with a secular comparator, similarly situated with respect to accepted zoning criteria,

2    such as "parking, vehicular traffic, and generation of tax revenue."  *See Centro Familiar*, 651 F.3d

3    at 1173 (citing *River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 373

4    (7th Cir. 2010) (en banc)).

5                               **a.       Accepted zoning criteria**

6          The goal of the City's assembly uses provision is "to stimulate commercial activity within

7    the City's downtown, which had been in a state of decline, and to establish a pedestrian-friendly,

8    active and vibrant Main Street."  Dkt. 28-5 at ¶ 5; *see generally* Dkt. 40-2 at 20:13-22 (deposition

9    testimony of Megan Hunter that focus in downtown core area is on "creating a special

10   entertainment oriented mixed use district with residential above the ground floor stories where you

11   have a lot of excitement, vibrancy …"); Ex. C to Dkt. 28-5 at Section 37-40.290 (defining

12   "Purpose" of central city overlay regulations to include "(a) Encourag[ing] and accommodat[ing]

13   the increased development intensity for mixed use, commercial, retail, and office uses within the

14   central city … (c) Promot[ing] live entertainment uses in the downtown core area of the city ..; and

15   (3) Encourag[ing] pedestrian-oriented neighborhoods where local residents and employees have

16   services, shops, entertainment, jobs, and access to transit within walking distance of their homes

17   and workplace.").

18         Similar goals have been regarded as accepted zoning criteria.  *See Centro Familiar,* 651

19   F.3d at 1172-73 (identifying accepted zoning criteria to include parking, vehicular traffic, and

20   generation of tax revenue); *Victory Center*, 2012 WL 1133643, at *6 (considering whether

21   religious organization was treated on less than equal terms than similar secular institutions with

22   respect to zoning ordinance that sought to encourage pedestrian-oriented retail activity on the

23   street level within a four-block subarea of city center); *see also River of Life*, 611 F.3d at  ("If the

24   reasons for excluding some category of secular assembly—whether traditional reasons such as

25   effect on traffic or novel ones such as creating a 'Street of Fun" … —are applicable to a religious

26   assembly, the ordinance is deemed neutral and therefore not in violation of the equal terms

27   provision").

28         Accordingly, the Court finds that the City's accepted zoning criteria are "to stimulate

United States District Court
Northern District of California

1    commercial activity within the City's downtown, which had been in a state of decline, and to

2    establish a pedestrian-friendly, active and vibrant Main Street." *See* Dkt. 28-5 at ¶ 5.

3                              **b.      Main Street theaters and cinemas**

4           The Court must next consider whether the assembly uses provision treats New Harvest on

5    a less than equal basis with similarly situated secular comparators with respect to the City's zoning

6    criteria.  New Harvest identifies the following four uses within the Main Street restricted area as

7    relevant comparators:  Maya Cinema, El Rey Theater, Fox Theater, and Ariel Theatre.  Dkt. 35 at

8    5-6, 12.  According to New Harvest, these four properties are "similarly situated secular

9    comparators with respect to the zoning criteria."  *Id.* at 12.  New Harvest characterizes the four

10   uses as "secular assemblies."  *Id.*  New Harvest's arguments and evidence regarding the operations

11   of the four cinemas/theaters, which focus on seating capacity, are as follows:

- **Maya Cinema:**  New Harvest states that this cinema is a "modern facility which shows first run films" in "14 theater rooms, all located on the ground floor" with one theater room seating 177, one seating 144, and the rest seating 44 persons. Dkt. 35 at 6; *see also* Dkt. 42 (Andrews Decl.) at ¶ 3.

- **El Rey Theater:**  New Harvest states that this theater had 800 seats when it opened in 1935, currently has a seating capacity of 400 on the main floor. Dkt. 35 at 6; Dkt. 36 at ¶ 17; Dkt. 40-8.  According to New Harvest, this theater has sat vacant for a number of years but has recently been sold.  Dkt. 35 at 6.

- **Fox Theater:**  New Harvest describes this property as a "multi-purpose venue" that "hosts weddings, quinceneras, business conferences, live music concerts, live comedy shows, and banquets."  Dkt. 35 at 6.  According to New Harvest, the building has multiple meeting rooms located on the first and second floors and advertises rentals of its facilities with banquet seating for 350 and wedding ceremony seating for over 500 persons.  *Id.*; *see also* Dkt. 36 at ¶ 18.

- **Ariel Theatre:**  New Harvest states that this is a venue with a capacity of 289 persons that houses a non-religious children's theater program where children and youth perform in large stage productions on Fridays and Saturdays and where

United States District Court
Northern District of California

1   classes for children are offered.  Dkt. 35 at 5-6; *see also* Dkt. 37 (Palacio Decl.) at

2   ¶ 4.

3   The City argues that these uses are not relevant secular comparators to New Harvest

4   because each promotes the City's accepted zoning criteria:

5   They are open to the general public.  Their doors are open regularly and for extended
    periods throughout the week.  They draw tourists and City residents who are seeking

6   leisure or entertainment.  Their windows and doors are large and open to the street,
    promoting foot traffic and personal safety.  They form the backbone of Main Street's

7   commercial activity.  Unlike private clubs and churches, cinemas and theatres support *all*

8   of the City's regulatory purposes.

9   Dkt. 48 at 9 (emphasis in original).

10  To evaluate a RLUIPA equal terms claim, the Court must identify the "objective criteria

11  addressed in the [challenged] code section" and evaluate whether the disallowed religious use is

12  similarly situated to "any secular comparator permitted in, not excluded from, the zone."

13  *Archbishop of Seattle,* 28 F. Supp. 3d at 1169 (citing *Centro Familiar*, 651 F.3d at 1174).

14  According to expert testimony regarding city planning submitted by Salinas, which New Harvest

15  does not refute, "[i]n the city planning field, it is well known that private assembly-type uses …

16  detract from a city's efforts to promote a vibrant, pedestrian-friendly downtown" because such

17  uses are "typically open only to organization members, operate during limited hours, generate

18  limited interest among the general public, and typically have 'blank facades.'"  Dkt. 28-2 (Aknin

19  Decl.) at ¶ 6.  By contrast, "movie theatres, nightclubs, restaurants, bars and other entertainment

20  venues … tend to attract far greater numbers of pedestrians to a city's downtown, again

21  encouraging increased commercial activity and a vibrant downtown atmosphere" because such

22  uses "are generally open more days of the week and hours of the day, including evenings and

23  weekends, are freely open to the general public, attract [a] far greater number of people into a

24  downtown area, and generate interest among city residents, residents from nearby communities,

25  and tourists to a far greater extent than do private clubs or churches."  *Id.* at ¶ 7, Ex. A.

26  With regards to New Harvest's proffered comparators, New Harvest has failed to show that

27  the Maya Cinema or Fox Theater are relevant comparators.  While the seating capacity of the

28  Maya Cinema and Fox Theater may be similar to New Harvest's proposed use of the Beverley

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1     Building, New Harvest's own evidence establishes that these properties, unlike New Harvest, offer

2     numerous activities throughout the week that would reasonably be expected to attract the general

3     public, such as first run films, weddings, concerts, comedy shows, and other events.  By contrast,

4     New Harvest offers no evidence that its activities actually draw any non-members, and no

5     evidence that its activities have a positive impact on commercial activity or vibrancy within the

6     Main Street restricted area.

7          Similarly, New Harvest has failed to establish that the El Rey Theater is a relevant

8     comparator.  The *only* evidence presented by New Harvest regarding the El Rey Theater is its

9     seating capacity, both currently (400 seats on the ground floor) and when the theater opened in

10    1935 (800 seats).  Dkt. 35 at 6; Dkt. 36 at ¶ 17; Dkt. 40-8.  However, this capacity information

11    provides no basis for comparing the operations of the El Rey Theater to New Harvest's proposed

12    use of the Beverly Building with respect to the City's zoning criteria of stimulating commercial

13    activity and vibrancy in the Main Street restricted area.

14         The evidence concerning the Ariel Theatre is more extensive and suggests more parallels

15    with the proposed operations of New Harvest, in that the theater is currently in use and appears to

16    offer shows mainly on weekends.  However, there is also evidence in the record that schools use

17    the theater, which indicates weekday activities at the property.  Dkt. 40-2 at 38:10-13 (testimony

18    of Salinas Community Development Director Megan Hunter that "both the Fox Theater and Ariel

19    Theater have a lot of schools that use their facilities so they have a lot of activity there").

20    Moreover, there is evidence that rehearsals and classes also occur at that theater, which suggests

21    that participants (and their parents) visit the theater area throughout the week.  *Id.* at 43:9-10

22    (testimony of Megan Hunter that Ariel Theater has classes and "rehearsals, and other things that

23    they do there.").  This evidence establishes that the Ariel Theater is not similarly situated to New

24    Harvest's proposed use of the Beverly Building with respect to the accepted zoning criteria, which

25    include fostering an active and vibrant Main Street.

26         Based on the evidence in the record concerning the particular Main Street cinemas and

27    theaters identified by New Harvest, the Court concludes that these properties are not "similarly

28    situated" to New Harvest's proposed use of the Beverly Building with respect to the City's zoning

18

1    criteria, which seek "to stimulate commercial activity within the City's downtown, which had

2    been in a state of decline, and to establish a pedestrian-friendly, active and vibrant Main Street."

3    *See* Dkt. 28-5 at ¶ 5.  Accordingly, the permitting of theaters and cinemas within the Main Street

4    restricted area does not establish a *prima facie* violation of RLUIPA's equal terms provision.

5    <strong>c.      Other uses in Downtown Core Area</strong>

6          New Harvest also cites the following actual or permitted uses within the Downtown Core

7    Area as evidence in support of its RLUIPA equal terms claim:  nursing homes, hospitals, and

8    residential care facilities; cemeteries; and government offices such as a post office, city hall, and

9    police stations.  Dkt. 35 at 15-16.  New Harvest argues that such uses "are not conducive to an

10   exciting and vibrant downtown which pulls in foot traffic."  *Id.* at 15.  However, New Harvest has

11   not offered any evidence that the City has permitted such uses within the Main Street restricted

12   area.  The actual or permitted existence of such facilities within the larger Downtown Core Area

13   does not support New Harvest's contention that the City's restriction of religious assemblies

14   within the three-block Main Street restricted area treats religious organizations differently than

15   secular organizations within that area.

16   **V.     CONCLUSION**

17         For the reasons discussed above, the Court **ORDERS** as follows:

18         1.  New Harvest's evidentiary objections (Dkt. 46) are **OVERRULED.**

19         2.  The City's evidentiary objections (Dkt. 48 at 21-22) are **OVERRULED.**

20         3.  New Harvest's request for judicial notice (Dkt. 41) is **GRANTED.**

21         4.  New Harvest's motion for summary judgment (Dkt. 35) is **DENIED.**

22         5.  The City's motion for summary judgment (Dkt. 28) is **GRANTED**.

23   **SO ORDERED.**

24   Dated: May 29, 2020

25

26

27                                    SUSAN VAN KEULEN
                                      United States Magistrate Judge

28

United States District Court
Northern District of California